Filed 4/11/14  P. v. Sanchez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B251336 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA373638) |
| v. | |
| JOSE LUIS SANCHEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sam Ohta, Judge.  Affirmed.

California Appellate Project, Jonathan B. Steiner and Richard B. Lennon, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

——————————

Defendant and appellant, Jose Luis Sanchez, appeals from the judgment entered following his pleas of no contest to two counts of attempted willful, premeditated and

deliberate murder (Pen. Code, §§ 664, 187)[1] and one count of assault with a firearm (§ 245, subd. (b)), and his admissions that, during one of the attempted murders, he inflicted great bodily injury (§ 12022.7), during each of the offenses he personally used a firearm (§§ 12022.5, 12022.53) and each of the offenses was committed for the benefit of, at the direction of or in association with a criminal street gang (§ 186.22, subd. (b)(1)). The trial court sentenced Sanchez to 38 years in state prison. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts* [2]

At approximately 2:10 a.m. on June 21, 2010, Mark Armendiriz and two friends left the Echo Club (the club), a bar on Sunset Boulevard in Echo Park, and began to walk west to look for a taxi or a place to have something to eat. When Armendiriz then heard what sounded like firecrackers popping, he and his friends ran down the street. Armendiriz slipped in behind a short wall and ducked down. One of Armendiriz's friends asked him if he had been shot and when Armendiriz looked down, he saw blood and realized he had been shot in the chest. It was later determined, the bullet had penetrated his lung and come out the side of his back. Armendiriz was ultimately taken to a hospital where he stayed for "a little over a week." Since that first week, Armendiriz has had to return to the hospital several times. In total, he has spent approximately one month there. Although his doctor told him his recovery would be complete by June 2011, as of the end of October 2010, he still could not lift heavy objects.

Both inside and outside the club, Armendiriz had not seen any trouble or heard anyone exchange words. The atmosphere had been peaceful and "the shooting came out of left field." It was "totally unexpected."

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     The facts have been taken from the transcript of the preliminary hearing. As Sanchez's trial resulted in a mistrial and he decided to enter a plea rather than be retried, the court reporter's notes of the trial, prior to proceedings held on April 3, 2012, were not transcribed.

2

Allan Judd, an audio engineer, was also at the club on the night of June 21, 2010. Judd, who had been wearing a black, long-sleeved shirt with the word Hollywood written across the front in red, and his girlfriend, Sophia Sadrina, had come to the club to hear a particular band. The mood inside the club had been "relaxed [and] social. It just seemed like a typical crowd to see a band."

While at the club, Judd, who rode motorcycles and owned a motorcycle shop, ran into a friend, David Drasin, who was wearing a denim vest with a "Hells Angels Motorcycle Club" patch on the back. According to Judd, a full-fledged member of the Hells Angels would be wearing a vest with a "full-patch." Such a patch would say "Hells Angels across the top . . . , have the logo in the middle . . . [and the] name of [a] state or other. . . location at the bottom." The writing on the patches would most likely be in red. Someone who is not a full member, or is working toward becoming one, would be known as a "prospect" and would have a patch on his vest which only showed the name of a location. Judd's friend Drasin had the full three patches on the back of his vest. Judd "associate[ed]" with a number of members of the Hells Angels, including Drasin, and had ridden motorcycles with them "a few times." Judd had never associated with a member of the Mongols Motorcycle Club.

At approximately 2:00 a.m., after the club had closed, Judd, Sadrina, Drasin and a fourth person stood in front, just to the west of the entrance, and talked for a time. As the group was standing there, Judd heard what "sounded . . . like the rack of a slide of a semiautomatic handgun." After Judd then heard some yelling and a "number of [gun]shots in fast succession" coming from the center of Sunset Boulevard, he and his girlfriend began to run toward the west while Drasin apparently ran toward the east. As Judd and Sadrina were running, Judd felt a gunshot hit him in the right forearm. The bullet entered on one side and exited on the other, breaking the bone. Judd was later required to have surgery, during which a plate was placed across the bone to fuse it back together. As of October, his arm was still "very weak" and he was unable to perform his regular work.

After Judd had been shot, he and his girlfriend took cover behind a short wall. There, they saw Armendiriz.

Judd had not seen the individual who had fired the gunshots and, at the time of the shooting, he did not know whether shots had been fired by more than one person.[3] He believed, however, that whoever had fired the shots had been "tracking" him.

While Judd was in the hospital, he was interviewed by the district attorney and members of other "law enforcement" agencies. Shortly after he was released from the hospital, he received a phone call from law enforcement personnel. The next contact he had with law enforcement officers was approximately one week before the present hearing, when detectives came to his home and served him with a subpoena directing him to appear.

Judd had not wanted to come to court for the hearing and had initially refused to accept the subpoena. Judd had then telephoned the district attorney and told him he did not wish to be involved in the matter "[b]ecause according to what the detectives [had] told [him and] what [he had seen] in the media, this [case] was connected to the conflict between . . . two motorcycle clubs, and [he did not] want to get in the middle of it." Judd was concerned, not only for his business, but for his "personal safety." He had "already been shot once over this and [he] just didn't want to get caught up in the middle." Accordingly, Judd was testifying reluctantly. He had appeared only because he had been "ordered to come to court."

Adam D'Zurilla had also been at the club on the night of June 21, 2010. He had gone to the club to see two of the bands playing there that night and had stayed until the club closed at approximately 2:00 a.m. After the club closed, D'Zurilla remained out in front where he was talking with a group of people just to the west of the entrance. As he and the others were standing there, a man "pull[ed] up on a motorcycle, walk[ed] into the middle of Sunset [Boulevard], shout[ed] 'Fuck you, mother fuckers,' and . . . started

---

**3** Judd was later shown a videotape of the scene which indicated there had been only one person firing shots from the street.

4

shooting into the crowd." In total, D'Zurilla heard between eight and 10 shots fired. One of the shots "grazed [D'Zurilla's] right temple." D'Zurilla then saw the shooter get back on his motorcycle and ride east down Sunset.

D'Zurilla had been in a position to see the individual who had fired the shots and after the incident he described the shooter to police officers as a heavyset man with a "[b]lack helmet, black sunglasses, . . . [and] facial hair." A couple of days before the hearing, police officers, after reading to D'Zurilla an admonition, showed him a series of photographs. Because the shooter had been wearing a "dome helmet" and sunglasses at the time of the shooting, "two faces" in the photographic line-up looked to D'Zurilla like the man who had shot him. When asked which photograph he believed was more likely that of the shooter, D'Zurilla indicated they were each "as equal as the other." However, at the hearing, D'Zurilla identified Sanchez and stated, "To my memory and the appearance of this guy here, [he] looks like the shooter." D'Zurilla indicated he was 85 percent certain as he had been "watching [the man] . . . before he even started shooting." While looking at Sanchez, D'Zurilla stated, "[T]his gentleman's facial hair is the exact facial hair."

On June 21, 2010, Daniel Ortega had been working as a security guard at the club.[4] Ortega had worked at the club for approximately two years and, during that time, Sanchez had been one of his co-workers. Sanchez, whose nickname was "Junior," had also worked as a security guard. Although both Sanchez's and Ortega's primary job had been to "check ID's" at the door to be certain everyone who entered the club was old enough to drink alcoholic beverages, one security guard would usually work inside the club to make "sure that if things seem[ed] to be getting hot between two groups," the groups were separated. Then, at 2:00 a.m., Ortega and the other security personnel would go inside the club, inform the patrons the club was closing and make sure everyone had left the premises.

---

**4**      Ortega was granted immunity from prosecution for his testimony.

5

On the night of June 21, Ortega noticed two men in the club wearing clothing indicating they were members of the Hells Angels Motorcycle Club (Hells Angels). One man was wearing a vest which had the words "Hells Angels" on the back and another man was wearing a long-sleeved shirt which had writing on the front, back and sleeves stating "Hells Angels." After he saw the two men enter the bar, Ortega "texted" Sanchez because Ortega had "heard around the club" that Sanchez "was with a motorcycle club" called the Mongols. As it was Ortega's understanding the Hells Angels and the Mongols did not get along Ortega, whose intent was simply to "jok[e] around," sent a text message to Sanchez stating, "Your friends are here." Sanchez then sent a text message to Ortega indicating he did not understand what Ortega was trying to tell him. In response, Ortega texted the word "Hells" to Sanchez. Ortega, who indicated he was just "playing around," did not expect Sanchez to react. However, "sometime later," Sanchez "showed up" at the club. Sanchez approached Ortega, said, "What's up?" and asked if "they were there." Ortega told Sanchez, "Yeah, they're inside." After Sanchez then told Ortega he was there to get his paycheck, he left the entrance area.

Ortega had not expected Sanchez to come to the club that evening and, when he did, Ortega became worried Sanchez "might just go inside or do something." When, approximately one hour before the club was to close, Sanchez walked out, Ortega felt better about the situation. There had been no disturbances inside the club and Ortega believed "nothing was going to really happen."

At 2:00 a.m., Ortega went to the gate at the doorway to the club and locked it. At that time, Ortega saw Sanchez standing next to his "bike," which was parked across the street. Ortega went back inside the club to make sure everyone had left and, at that point, heard shooting. Ortega did not see the shooting as it happened. He saw it only later, when he was shown a videotape.

When Ortega heard approximately seven or eight shots fired, he let some people back into the club "to escape the gunfire." One of those individuals was Drasin, who was wearing the Hells Angels vest.

6

After the shooting, police officers arrived and one of the detectives showed to Ortega a video of the shooting. At that time, Ortega recognized the shooter as Sanchez. When Ortega was then shown a still photograph taken from the video, he drew a box around a person standing in the street with his arm outstretched, holding a gun, and identified him as Sanchez. There was "no doubt" in Ortega's mind the person shown as the shooter was Sanchez.

On July 9, Ortega met with some detectives who, after reading to him an admonishment, showed him a group of photographs. Ortega circled a photograph of Sanchez, then wrote on the photograph, "No. 3 is the guy I saw the night of the shooting . . . beard up to about his upper chest. Mustache and sideburns, long hair . . . he shot at the crowd of people at Echo."

When, during a previous interview, Ortega had been asked if he had seen where Sanchez had parked his bike, Ortega had answered, "No." He had answered in that way because he had been "scared" and "worried . . . [he] might get into a little bit of trouble." Ortega had also failed to tell the detectives that, when Sanchez had come to the club, he had asked Ortega, "Where are they?" Ortega was concerned about the text message he had sent to Sanchez so, when he was first interviewed on July 9, he did not "tell [the investigating officers] everything [he] knew." Ortega admitted, when he felt threatened, he could be less than honest.

Los Angeles Police Department Detective Jose Mireles, an expert on gangs, including motorcycle gangs, and Officer Chang were the investigating officers assigned to this case. As part of his investigation, at approximately 6:00 a.m. on July 14, 2010, Mireles served a search warrant at two houses, one of which was in front of the other on a lot on Calzona Street. After Mireles and other officers had surrounded the property, an officer in a black and white patrol car used his speaker to call to Sanchez and instruct him to come outside.

As he and his fellow officers then executed the warrant, Mireles noted there was a security camera on the front porch of the front house with a wire which led to a monitor in the back house. The camera was "trained" toward the street in front of and on the

7

south side of the house. During the search of the two houses, officers found various papers and documents which indicated Sanchez and his girlfriend lived in the back house.[5] There, law enforcement personnel found "9-millimeter [live] ammunition [in] the toilet bowl," a loaded 12-gauge shotgun, live 12-gauge rounds and a handgun. In addition, officers found in the house a nine-millimeter Glock magazine, .38-caliber ammunition and, in a flower pot just outside the house, an unloaded .357-caliber handgun. It was later determined the .357-caliber handgun was registered to a full-fledged member of the Mongols named Omar Sergio Olivas.

In addition to the guns and ammunition, police officers found in Sanchez's house Mongols outlaw motorcycle gang paraphernalia, including a large Mongols belt buckle and a black lanyard with a Mongols logo. There were Mongols stickers on a windowpane and, outside the house, just south of the front porch, was a parked motorcycle.

At some point Mireles had a conversation with an Officer Brinker, one of the officers who had responded to the site of the shooting outside the club. Brinker indicated she had recovered from Sunset Boulevard 11 spent nine-millimeter casings. When Mireles and Officer Chang compared the spent casings with the live nine-millimeter ammunition found in Sanchez's toilet bowl, they discovered they both had been made by the same manufacturers, "RP, FC and Winchester."

As part of his investigation, Detective Mireles also obtained videotapes taken from three security cameras in front of the club. One of the tapes showed a person in the middle of Sunset Boulevard who "appear[ed] to be extending his hand . . . in a southwest direction." Another tape showed a group of four individuals, including Drasin, Judd and Judd's girlfriend, Sadrina, step outside the club and stand next to a tree just west of the entrance. A "figure" dressed in all black then walked from the north side of the street to the center, raised his arm and shot at the four individuals by the tree. As Drasin ran east, the shooter appeared to track him. However, when the shooter apparently lost sight of

---

[5]     It appeared Sanchez's parents and brother lived in the front house.

8

Drasin, he shifted his attention to Judd and his girlfriend, who were running west on Sunset.

Mireles indicated, based on his knowledge of motorcycle street gangs, the Mongols and the Hells Angels are "bitter enemies." Because he had been wearing a vest with Hells Angels patches and had, at one time admitted to another detective he was a Hells Angel, Mireles believed Drasin was a full-fledged member of the Hells Angels gang. As Sanchez was apparently associated with the Mongols, it was Mireles's opinion Sanchez and Drasin would be considered mortal enemies. If Sanchez, who Mireles believed was a "prospect" for membership in the Mongols gang, were then to be notified that members of the Hells Angels were at the club, he would be acting at the direction of, in furtherance of and for the benefit of the Mongols by going to the club and taking violent action against the individuals identified as members of the Hells Angels. In addition, Sanchez would gain respect within the Mongols by shooting at Drasin and any other person who appeared to be affiliated with the Hells Angels.[6]

2. *Procedural history.*

In an amended information filed on November 18, 2010, Sanchez was charged with three counts of attempted, willful, deliberate and premeditated murder (§§ 664, 187, subd. (a)) (counts 1, 3 and 4), during each of which he personally used a firearm, a handgun within the meaning of section 12022.53, subdivisions (b) and (c), causing the attempted murders to be serious (§ 1192.7, subd. (c)(8)) and violent (§ 1192.7, subd. (c)(8)) felonies within the meaning of section 667.5, subdivision (c)(8). He was also charged with two counts of assault with a semiautomatic firearm (§ 245, subd. (b)) (counts 2 and 5), during both of which he personally used a firearm within the meaning of sections 1203.06, subdivision (a)(1) and 12022.5, subdivision (a), causing the offenses to be serious (§ 1192.7, subd. (c)(8)) and violent (§ 667.5, subd. (c)(8)) felonies, and during one of which (count 2) he personally inflicted great bodily injury upon the victim

---

[6] It was stipulated that both the Mongols and the Hells Angels are criminal street gangs within the meaning of section 186.22.

pursuant to section 12022.7, subdivision (a), causing the offense to be a serious felony within the meaning of section 1192.7, subdivision (c)(8). Finally, it was alleged as to all counts the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang pursuant to section 186.22, subdivision (b)(1)(C), causing them to be serious felonies within the meaning of section 1192.7, subdivision (c)(28). At his arraignment, held on December 10, 2010, Sanchez pled not guilty to each count and denied the special allegations.

A jury trial in the matter began on March 14, 2012. Although Sanchez presented in his defense the testimony of four witnesses, including that of an expert on eyewitness identifications, he chose not to testify.

On April 3, 2012, during its deliberations, the jury requested a read back of the following testimony: "(1) Ortega – Identifying/denying the shooter and time leading up to identifying the shooter. [¶] (2) Decottle – Whether Sanchez showed up for work after the incident. [¶] (3) Chang's conversation/testimony re: Another conversation occurred before recording [of interview with Ortega]." In response, the trial court indicated, "The reporter who took the notes for Chang is not available until 3:00 p.m. [¶] The reporter who took the notes for Ortega's testimony cannot be here until tomorrow."

After both counsel and Sanchez agreed they need not be present for the read back of testimony, the court reporters went back to the jury room and read to the jury the requested portions of the record. The jury then continued its deliberations. At some point after that, the foreperson sent to the trial court a note indicating the jury was "still" deadlocked.[7] The following colloquy then occurred: "The Court: . . . I received a note from the foreperson indicating that the jurors are still deadlocked. [¶] . . . [¶] I have to ask you those same questions as yesterday. First of all, is there anything that I could do to assist the jury in arriving at its verdict? [¶] Juror No. 1: No, Your Honor. [¶] The Court: How many ballots have been taken by the jury? [¶] Juror No. 1: Total from

---

[7] On the previous day, April 2, 2012, the foreperson had apparently informed the trial court the jury was deadlocked.

10

yesterday and today?  [¶]  The Court:  Yes.  [¶]  Juror No. 1:  Five.  [¶]  The Court:  What is the numerical breakdown without telling me who voted guilty and not guilty?  [¶] Juror No. 1:  Ten and two."  When the trial court then asked each of the 12 jurors if he or she agreed with the assessment of the foreperson, each juror indicated he or she agreed the jury was deadlocked.

After concluding the jury was hopelessly deadlocked, the trial court declared a mistrial and asked the foreperson "the direction of the last ballot."  The foreperson indicated the vote had been "ten to two in favor of conviction."  The trial court then discharged the jury.

When the trial court stated there might be a retrial, defense counsel indicated he had not been retained for such a proceeding and, in case he was not and a different attorney was appointed to represent Sanchez, that attorney would benefit from having access to transcripts of the trial which had just occurred.  Under the circumstances, counsel requested the trial court to order that transcription of the notes from the trial be expedited.  The trial court indicated it was not yet going to order transcripts as it was possible the matter might be "resolved."

At proceedings held on June 17, 2013, the trial court indicated the court and counsel had discussed the matter and defense counsel had informed them Sanchez was "willing to take 38 years to resolve this case."  The trial court addressed Sanchez, indicated he had already been to trial once and the jury had "hung ten to two in favor of guilt" and now there was "some additional new evidence."  Sanchez then indicated he was willing to enter pleas and accept a sentence of 38 years in the matter.  After the trial court advised Sanchez he had the right to a court or jury trial, the right to confront and cross-examine the witnesses against him, the right to call witnesses in his defense, the right to "testify on [his] own behalf" and the right against "self-incrimination,"  Sanchez indicated he understood and was waiving those rights and also understood he would be serving 85 percent of the 38-year sentence as the crimes he would be admitting were "violent" felonies.

11

After the People amended one of the counts which alleged attempted murder (count 3) to add the special allegations of the personal use of a firearm (§ 12022.5, subd. (a)) and the personal infliction of great bodily injury (§ 12022.7, subd. (a)), Sanchez pled no contest to the crime and admitted the allegations. In addition, Sanchez admitted he had committed the crime at the direction of, in association with and for the benefit of a criminal street gang pursuant to section 186.22, subdivision (b). With regard to count 1, which also alleged the crime of attempted murder, Sanchez entered a plea of no contest. Finally, as to count 2, which alleged Sanchez committed assault with a deadly weapon, a semiautomatic firearm, Sanchez pled no contest. He then admitted that, during that offense, he personally used a firearm and personally inflicted great bodily injury. The trial court found Sanchez's waivers had been "knowingly, intelligently, expressly, explicitly, and understandingly made and . . . there [had been] a factual basis for [the] plea."

On July 9, 2013, at a hearing which had been scheduled for sentencing, Sanchez made a *Marsden*[8] motion and a motion to vacate his plea pursuant to section 1018. The trial court first heard the *Marsden* motion. During that proceeding, Sanchez asserted, from the day he entered the plea, he "was [actually] expecting to go to trial and [he] felt like [they] were ready. [His counsel had] told [him they] were going to go to trial, and then when it came to, he [told Sanchez they would be] better off just taking [the] deal but [they could later] retract it, . . . and it [would] be like [they were] waiving time. [¶] So in [his] head [Sanchez was] thinking [they were] going to retract the deal then later on [they would] just waive time." Sanchez "really [wanted] to file some motions to try to get things dropped down, from all the premeditated to all [the] gang enhancement[s] [since he was] not even a gang member."

The trial court then addressed Sanchez and stated, "I was told that you had changed your mind about the trial and that you wanted to resolve [this case] by way of a plea. And . . . I walked through the plea with you and I discussed this with you and you

---

[8]     *People v. Marsden* (1970) 2 Cal.3d 118.

indicated that you understood it all and you [wished to change] your plea. So what I'm hearing . . . when you're talking to me now is that your lawyer said to you that a change in plea was like a motion to continue and that you [could] withdraw it?" Sanchez responded, "No," but he had understood that, after entering the plea, he would be able to come back to court, "take back the deal," make some motions and go to trial. Sanchez continued, "The fact was it was either take the deal or start picking a jury because the jury was here. The court wouldn't allow us to just say I'll send the jury home and let us waive time now and we'll come back next month and maybe we'll see if we're ready for trial then." Sanchez then stated, "To me I just feel like maybe if I had another lawyer to represent . . . me . . , then . . . it could help me out with what happened. And to take the deal back . . . obviously I would need more time . . . . That's why I'm figuring if you take the deal back, then I dismiss the lawyer, then I could get another lawyer that would help me understand more of what's going on."

After indicating it did not believe what Sanchez had told him was logical or credible and it wished to focus, not on what Sanchez had expected, but on counsel's thoughts, the trial court asked counsel for his explanation of the situation. Defense counsel indicated, on or sometime shortly before the day jury selection for the second trial was to begin, he had learned the People had obtained additional forensic and ballistic evidence which was, in counsel's view, "really damaging." If requesting a continuance would have somehow diminished the impact of the new evidence, counsel was of the opinion "[a] continuance could have been gotten." Counsel and Sanchez had apparently discussed waiving time and counsel indicated, "[W]ithout saying any specifics about what the conversation was, [they had decided that, if they had] wanted to waive time, [they would have] waive[d] time a hundred times. . . . Waiving time wasn't really a problem." Counsel indicated he was ready to proceed to trial. However, when the trial court asked the parties whether there had been "substantial plea discussions and there hadn't, the focus then admittedly shifted. . . . [Counsel's] advice became, 'Let's focus on this,' . . . [b]ecause we always have the trial. . . . If we [don't] reach a deal, we don't reach a deal . . . . I don't know what kind of shift [that] information caused in Mr.

13

Sanchez's mind. . . . [¶] It may have caused him duress. It may have caused him to make a decision in ignorance, . . . mistake, or inadvertence."

With regard to withdrawing a plea, counsel indicated he understood "the standard is clear and convincing [and] . . . that standard has been said to leave an unhesitating assent of every reasonable mind." In addition, counsel was familiar with buyer's remorse, "which would be understandable" in a case where a defendant accepted a plea for "a lot of time." On the other hand counsel, from his discussions with Sanchez, could not understand how Sanchez could "believe[] entirely what he [said]." However, counsel indicated he "want[ed] Mr. Sanchez to go forward and get his new lawyer or new trial and do what he [felt was] in his conscience."

After listening to counsel's explanation of the proceedings, the trial court determined counsel "believe[d] a continuance [would have been] . . . available without too much trouble" and understood "the standard to be applied in a motion to vacate a plea." The court concluded, "[A]dding those two things together . . . would circumstantially establish that [counsel] did not say to [Sanchez] that he ought to take the deal and that it would be easy to take it back at a later point." Although Sanchez may have had many reasons for requesting new counsel, the trial court determined he, under the circumstances presented, had failed to show there had developed a "substantial impairment" of the attorney-client relationship. Accordingly, the court denied Sanchez's *Marsden* motion and postponed the next proceedings to July 22, 2013, in order to give Sanchez time to consider whether to pursue his motion to withdraw his plea or to proceed to sentencing.

On July 22, 2013, Sanchez indicated he wished to withdraw his motion to vacate his plea and proceed with sentencing. Accordingly, pursuant to the agreed upon disposition, the trial court chose the attempted murder alleged in count 3 as the principal offense and sentenced Sanchez to the high term of nine years as to that count, then added to the nine years a term of 10 years for the gun allegation, a term of 10 years for the gang allegation and three years for the great bodily injury allegation, for a total of 32 years. With regard to the attempted murder charged in count 1, the trial court imposed a

14

consecutive term of "one third of five years, [or] one year, eight months." For the assault alleged in count 2, the trial court imposed "one third of six years, [or] two years." Consecutive to that term, the trial court sentenced Sanchez to "one third of the GBI allegation [or] one year . . . [a]nd one third [of] the gun allegation of one year four months," for an aggregate term of 38 years in prison.

With regard to "actual victim restitution," the trial court ordered Sanchez to pay Allan Judd $25,258.61 pursuant to section 1202.4, subdivision (f). Although it had previously been determined Sanchez should pay the "Victims' Compensation Government Claims Board" $37,194.99, the trial court delayed making that order until various legal issues regarding the amount of restitution had been resolved. The trial court then ordered Sanchez to pay a $280 restitution fine (§ 1202.4, subd. (b)), a stayed $280 parole revocation restitution fine (§ 1202.45, subd. (a)), a $40 court security operations assessment as to each count (§ 1465.8, subd. (a)(1)) and a $30 criminal conviction fee (Gov. Code, § 70373). After awarding Sanchez presentence custody credit for 1105 days actually served and 165 days of good time/work time, or credit for 1270 days, the trial court dismissed all remaining counts and allegations.

Sanchez filed a timely notice of appeal on September 11, 2013.

## CONTENTIONS

After examination of the record, appointed appellate counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record. By notice filed January 14, 2014, the clerk of this court advised Sanchez to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider. No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

## DISPOSITION

The judgment is affirmed.

15

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

CROSKEY, J.